UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRUIT STREET HEALTH P.B.C, and LAURENCE N. GIRARD, <br><br> *Plaintiffs*, <br><br> v. <br><br> FLASH FUNDING LLC; STEVEN EDISIS; and JOHN AND JANE INVESTORS, <br><br> *Defendants*. | Civ. A. No.: |

## COMPLAINT

Plaintiffs, Fruit Street Health PBC ("Fruit Street"), and Laurence N. Girard ("Girard," collectively, "Plaintiffs"), allege as against Defendants, Flash Funding, LLC ("Flash Funding"), Steven Edisis ("Edisis"), and John and Jane Doe Investors (collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This is a RICO action against a merchant cash advance ("MCA") company that is controlled and manipulated by Steven Edisis to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain funds from Fruit Street. Flash Funding entered into the so called "Merchant Agreements" (the "Agreements") on October 24, 2019, August 14, 2020, December 28, 2020, March 5, 2021, and April 22, 2021 with Fruit Street pursuant to which it purportedly paid lump sums to purchase Fruit Street's future receipts at a discount and Fruit Street agreed to repay the face value of its receipts through daily payments. *See* **Exhibits A-E**, respectively. While couched as the purchase and sale of future receipts, the Agreements' terms, conditions, and actions of Flash Funding demonstrate that despite the form the of the Agreements, no sale of receipts ever took place and the form of the Agreements were merely a sham to evade applicable usury laws. In reality, the Agreements were loans that charged interest rates from 125%

to as high as 245%, rates that are far greater than the maximum 25% permitted under New York Penal Law.

2.      It is against this backdrop that Fruit Street and Girard file this Complaint.

## THE PARTIES

3.      Plaintiff, Fruit Street Health, is a public benefit corporation duly organized under the laws of Delaware with its principal place of business located in New York, New York.

4.      Plaintiff, Laurence N. Girard, is an individual resident and citizen of New York. Girard is the owner of Fruit Street and provided a personal guaranty for each of the Agreements.

5.      Defendant, Flash Funding, LLC, is a limited liability company organized and existing under the laws of the State of New York with its principal offices located at 410 E 3rd Street, Brooklyn, NY 11218.

6.      Steven Edisis, is the sole LLC owner of Flash Funding, LLC, and is a resident and citizen of Florida.

7.      Upon information and belief, each of the John and Jane Doe Investor Defendants is a citizen of New York or New Jersey.

## JURISDICTION

8.      This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeering Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961-68.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

10.     Defendants are subject to the personal jurisdiction of this Court because Defendants have voluntarily subjected themselves to the jurisdiction of this Court; regularly transact business

within the State of New York, and/or has purposefully availed themselves of the jurisdiction of this Court for the specific transaction at issue.

## FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry.

11.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[1] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

12.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]  The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."  *Id.*

### B.     The MCA Agreement is Substantively and Procedurally Unconscionable.

13.      The MCA Agreements entered into by the Plaintiffs, are unconscionable contracts of adhesion that were not negotiated at arms-length.

14.     Instead, they contain one-sided terms that prey upon the desperation of businesses and their individual owners and help conceal the fact that the transactions, including these involving Fruit Street, are really loans.

---

[1] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

15.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the Defendants the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the Defendants, (4) a one-sided attorneys' fees provision obligating the merchant to pay the Defendants' attorneys' fees but not the other way around, (5) a personal guarantee, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) the maintenance of business interruption insurance, (11) the right to direct all credit card processing payments to the Defendants, and (12) a power-of-attorney "to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to purchaser from credit card processor and/or account debtor(s) of Sellers; (B) upon occurrence of an Event of Default to perform any and all obligations of Seller under this Agreement[.]"

**C.     The Defendants Use a Sham Reconciliation Provision to Disguise the Loans.**

16.     In order to evade state usury laws, the Defendants include sham reconciliation provisions in their MCA agreements to give the appearance that the loans do not have a definite term.

17.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to see the repayment of any excess money paid. Thus, if sales decrease, so do the payments.

18.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA

company is entitled to keep is $25,000. Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

19.     In order to ensure that a merchant can never use their sham reconciliation provision, however, Defendants falsely represent that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased. By doing so, Defendants ensure that if sales decrease, the required fixed daily payments remain the same.

20.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the Defendants falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

21.     On information and belief, Defendants do not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

22.     Moreover, the reconciliation provisions in the Agreements are intentionally rendered virtually impossible to use in that the merchant may only seek reconciliation once a month, and only within five (5) workdays after the month ends.  *See* Exs. A-E § 11.

23.     As this District has already recognized, MCA agreements with this temporal reconciliation limitation renders the provision illusory because the merchant could default under the MCA agreement by failing to make payment before it is even contractually allowed.

24.     Indeed, under these Agreements, if the merchant fails to make a daily or weekly payment just four (4) times over the life of the Agreement, it is in default, which is an intentional design such that the merchant cannot then seek reconciliation.  *Id*. § 27(h).

25.    In practice, whenever Fruit Street made a reconciliation request, Defendants either (a) ignored the request and/or refused to repay any overcollection or adjust future payments; or (b) only agree to adjust future payments, with no possibility of Fruit Street being reimbursed for overcollections based on that week's receivables, and these adjustments were made arbitrarily with no attempt by Defendants to actually review Fruit Street's receivables to determine the correct adjustment amount based on the purported percentage of Fruit Street's receivables Defendants purchased.

D.    **Defendants Intentionally Disguised the True Nature of the Transactions.**

26.    Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)    The daily payments required by the Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws. Rather, just like any other loans, the purchased amounts were to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amounts. The Agreements sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default and upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)    While the Agreements purported to "assign" all of the merchant's future account receivables to Flash Funding until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, Defendants merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;

(d)    Unlike true receivable purchase transactions, the Agreements were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)    The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by Defendants based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, Defendants did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f) The amount of the daily payments was determined based upon when Defendants wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g) Defendants assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h) Defendants required the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the merchants would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected Defendants from any risk of loss resulting from the merchant's failure to generate and collect receivables;

(i) Defendants required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which Defendants knew were breached from day one.

## FACTUAL BACKGROUND

### A.    Fruit Street's Business.

26.    Fruit Street is a healthcare services provider that delivers the CDC's National Diabetes Prevention Program via telehealth and live group video conferencing with registered dietitians.  The program is designed to help 88 million Americans living with prediabetes to avoid developing Type 2 diabetes, an expensive healthcare condition.  The National Diabetes Prevention Program has been proven to help individuals with prediabetes reduce their risk for Type 2 diabetes by more than 58% based on Medicare funded research published in the New England Journal of Medicine.  Fruit Street is a company owned by more than 500 physicians and is a public benefit corporation focused on having a social impact by improving the health of the public.

27.    As a public benefit corporation Fruit Street, unlike traditional C Corporations whose primary interest is maximizing shareholder value, balances stakeholders' pecuniary interests, prioritizes the interests of those who are involved and affected by the corporation (such

30902977v.1

as employees and customers), as well as the advancement of their intended public benefit goal for improving society.

28.     Fruit Street's clinical outcomes have been endorsed by the Centers for Disease Control & Prevention evidenced by the fact that Fruit Street was awarded full recognition for its outcomes by the CDC. This means that Fruit Street is consistently delivering high quality healthcare outcomes to individuals with prediabetes.

     **B.     Fruit Street and the MCA Industry.**

29.     Like many MCA companies, Defendants prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Although their agreements are titled "Merchant Agreement" and purport to represent the sale/purchase of a businesses' future revenue, Defendants market, underwrite and collect upon their transactions as loans, with interest rates far above those permissible under New York Law.

30.     In their marketing, Defendants expressly describe the transactions as "loans" and describe themselves as "lenders."

31.     Defendants also consistently describe their financial products as "loans" in their direct communications with merchants and describe themselves as "lenders" and the merchants as "borrowing" funds.

32.     Indeed, as reflected in text messages below between Plaintiffs and Defendants, when the parties negotiated the terms of the Agreements with Defendants, Defendants presented the Agreements as loans with fixed terms of a specific number of days, a key factor under New York law rendering an MCA agreement actually a loan.

33.     The fact that Defendants negotiated these purported purchases of Plaintiffs' future receivables with fixed durations based on the amount of funds advanced to Plaintiffs shows that regardless of the labels, the Agreements were always understood and treated as loans.



30902977v.1

34.     Defendants also show in their underwriting practices that their agreements are loans. Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing. When underwriting new transactions, Defendants do not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

35.     When Defendants collect upon their MCA agreements, they treat them just like loans. For example, Defendants require the merchant to make fixed daily payments and grant security interests to Defendants in substantially all of the merchant's assets to ensure that the daily payments are made.

36.     Defendants also require the merchants to execute confessions of judgment that Defendants file if the merchant failed to make as few as two daily payments under its agreements. In other words, Defendants structure the transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

37.     Fruit Street fell victim to all of these predatory tactics.

**C.      The Defendant Loans to Fruit Street.**

**<u>The October 24, 2019 Loan</u>**

38.     Under the October 24, 2019 Agreement, Flash Funding agreed to advance $35,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase 3.15% of Fruit Street's Future Receipts until such time as the amount of $52,150 (the "Purchased Amount") was repaid. *See* **Exhibit A** at 1.

39.     The Purchased Amount was to be repaid through daily ACH withdrawals in the amount of $651.88 (a "Daily Payment") such that the Purchased Amount would be repaid in just

-11-

80 days, which on its face, translates into an annual interest rate of more than 125% per annum or five (5) times the maximum 25% rate permitted under New York penal law. *See Id*.

40.    Even worse, Flash Funding did not advance Fruit Street the full Purchased Amount. Instead, Flash Funding charged a fee to cover underwriting and the ACH debit program for a total of $2,100. *See Id*. at 10.

41.    While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Flash Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**The August 14, 2020 Loan**

42.    Under the August 14, 2020 Agreement, Flash Funding agreed to advance $65,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 15.47% of Fruit Street's Future Receipts until such time as the amount of $97,435  (the "Purchased Amount") was repaid. *See* **Exhibit B** at 1.

43.    The Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $8,857.73 (a "Weekly Payment") such that the Purchased Amount would be repaid in just 55 days, which on its face, translates into an annual interest rate of more than 222% per annum or nearly 9 times the maximum 25% rate permitted under New York penal law. *See Id*.

44.    Even worse, Flash Funding did not advance Fruit Street the full Purchased Amount. Instead, Flash Funding charged a fee to cover underwriting and the ACH debit program for a total of $2,437.50. *See Id*. at 10.

45.    While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Weekly Payments, Flash Funding performed little or no due diligence and the

actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**The December 28, 2020 Loan**

46.    Under the December 28, 2020 Agreement, Flash Funding agreed to advance $75,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 17.17% of Fruit Street's Future Receipts until such time as the amount of $112,425 (the "Purchased Amount") was repaid. *See* **Exhibit C** at 1.

47.    The Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $11,242.50 (a "Weekly Payment") such that the Purchased Amount would be repaid in just 55 days, which on its face, translates into an annual interest rate of more than 245% per annum or nearly ten (10) times the maximum 25% rate permitted under New York penal law. *See Id*.

48.    Even worse, Flash Funding did not advance Fruit Street the full Purchased Amount. Instead, Flash Funding charged a fee to cover underwriting and the ACH debit program for a total of $2,000. *See id*. at 10.

49.    While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Flash Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**The March 5, 2021 Loan**

50.    Under the March 5, 2021 Agreement, Flash Funding agreed to advance $125,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 3.31% of Fruit

Street's Future Receipts until such time as the amount of $187,375 (the "Purchased Amount") was repaid. *See* **Exhibit D** at 1.

51.    The Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $15,614.59 (a "Weekly Payment") such that the Purchased Amount would be repaid in just 60 days, which on its face, translates into an annual interest rate of more than 200% per annum or more than 9 times the maximum 25% rate permitted under New York penal law. *See Id.*

52.    Even worse, Flash Funding did not advance Fruit Street the full Purchased Amount. Instead, Flash Funding charged a fee to cover underwriting and the ACH debit program for a total of $4,687.50. *See Id*. at 19.

53.    While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Weekly Payments, Flash Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

**The April 22, 2021 Loan**

54.    Under the April 22, 2021 Agreement, Flash Funding agreed to advance $200,000 (the "Purchase Price") to Fruit Street in exchange for the purported purchase of 22.67% of Fruit Street's Future Receipts until such time as the amount of $299,800 (the "Purchased Amount") was repaid. *See* **Exhibit E** at 1.

55.    The Purchased Amount was to be repaid through weekly ACH withdrawals in the amount of $21,414.29 (a "Weekly Payment") such that the Purchased Amount would be repaid in just 70 days, which on its face, translates into an annual interest rate of more than 170% per

annum or nearly seven (7) times the maximum 25% rate permitted under New York penal law. *See Id*.

56.     Even worse, Flash Funding did not advance Fruit Street the full Purchased Amount.  Instead, Flash Funding charged a fee to cover underwriting and the ACH debit program for a total of $7,500. *See Id*. at 19.

57.     While the ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Weekly Payments, Flash Funding performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee. Indeed, in reality, the ACH Program Fee was merely additional disguised interest.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

58.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.     The Unlawful Activity.**

59.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

60.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

61.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp*., 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled "An Investigation of the Loan-Shark Racket" brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment.

62.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

63.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

64.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

65.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

66.     Like here, this was a purely artificial device used by the loan shark to evade the law—an evasion that the Legislature sought to prevent.

67.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

68.     Edisis and the John and Jane Doe Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

69.     At all relevant times, Edisis and the John and Jane Doe Investors were, and are, persons that exist separate and distinct from the Enterprise, described below.

70.     Edisis has an ownership interest in Flash Funding and is the mastermind of the Enterprise.

71.     The John and Jane Doe Investors are individuals and business entities that provide funding for the loans.

72.     Through their operation of Flash Funding, the Defendants solicit, underwrite, fund, service and collect upon unlawful debt incurred by small businesses in states that do not have usury laws.

### C.     The Enterprise.

73.     Edisis, Flash Funding, and the John and Jane Doe Investors constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

74.     Edisis, Flash Funding, and the John and Jane Doe Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

75.     Since at least 2017 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

76.     The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes; and (ii) the interest rates are more than twice the legal rate permitted under New York Penal Law §190.40.

### D.     The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.

77.     The Defendants have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in

order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

### i. Steven Edisis

78.     Edisis is an owner of Flash Funding and the mastermind of the Enterprise. He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of the John and Jane Doe Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

79.     In his capacity as the mastermind of the Enterprise, Edisis is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivables purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Fruit Street.

80.     Edisis has also taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans, and executing legal documents in support of the Enterprise.

81.    Edisis has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Flash Funding and his own personal bank account(s).

ii.    **Flash Funding**

82.    Flash Funding is a company organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Edisis and the John and Jane Doe Investors.

83.    Edisis and the John and Jane Doe Investors have operated Flash Funding as part of an unlawful enterprise to collect upon unlawful debt. Pursuant to its membership in the Enterprise, Flash Funding has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of John and Jane Doe Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments in its name to further collect upon the unlawful debt.

84.    In this case, Flash Funding, through Edisis and the John and Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Fruit Street.

### iii.    The John and Jane Doe Investors.

85.    The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Flash Funding and Edisis.

86.    Directly and through their members, agent officers, and/or employees, the John and Jane Doe Investors have been and continue to be responsible for providing Flash with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements at issue here, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

87.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.    Interstate Commerce.

88.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily activities.

89.    Specifically, members of the Enterprise maintain offices in New York and New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, including Fruit Street, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

90.    In the present case, all communications and interactions between the members of the Enterprise and Fruit Street were by interstate email and mail, interstate wire transfers or ACH

30902977v.1

debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the Daily Payments via interstate electronic ACH debits.

91.     In addition, at the direction of Defendants, each of the Agreements were executed in states outside of New York, and original copies of the Agreements and applicable Confession Affidavits were sent from New York to the Enterprise, through Defendants, at their offices in New Jersey.

**F.     Injury and Causation.**

92.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

93.     The injuries to the Plaintiffs are directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in unlawfully collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

94.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

95.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

96.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

97.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

98.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise, and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

99.    Each Defendant agreed to facilitate, conduct, and participate in the conduction, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements.

100.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

101.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

102.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

103.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

104.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## THIRD CAUSE OF ACTION
### (In the alternative, Breach of Contract)

97.     Plaintiffs repeat and re-allege each of the above allegations.

98.     Each of the MCA agreements contained an appendix setting forth sham fees chargeable to Plaintiffs.

99.     Defendants improperly deducted an "Origination fee that comprised of $1,750 for the October 24, 2020 agreement, $1942.50 for the August 14, 2020 agreement, and $1,500 for the December 28, 2020 agreement. This fee was fraudulent as it was simply a ploy to extract additional funds from Plaintiffs and did not actually comprise of related expenses pertaining to origination. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.

100.    Defendants also deducted an ACH fee that comprised of $350 for the October 24, 2020 agreement, $495 for the August 14, 2020 agreement, and $500 for the December 28, 2020 agreement because "ACH's are labor intensive and are not an automated process, requiring us to charge a fee to cover those costs." In actuality, the ACH operations are fully automatic and cost a mere fraction of the fees charged to Plaintiffs.

101.    For the March 5, 2021 and the April 22, 2021 agreements, Defendants charged 3.75% of the proposed funding amount "to cover Origination, underwriting and Relating Expenses.

102.    Defendants also deducted an NSF Fee and a Wire Fee, which were similarly a fraudulent ploy to extract funds from Plaintiffs by using a sham misnomer characterization of fees.

103.    The MCA agreements represented that these fees were for services or costs purportedly provided by or incurred by the Enterprise MCA Companies in connection with their

respective agreements, but, in reality, these services or costs were never provided or incurred or were otherwise provided or incurred for amounts far below those stated in the MCA agreements and the so-called "fees" were nothing more than additional profits reaped by the Enterprise MCA Companies under the MCA agreements.

104.    For example, each of the MCA agreements provided for an "Origination/Underwriting Fee." However, the Enterprise MCA Companies performed little or no due diligence and conducted very little underwriting when entertaining into the MCA agreements.

105.    The Enterprise MCA Companies knew that their representations concerning the nature and purpose of the Origination Fee and other fees discussed above were false and misleading at the time they entered into the MCA Agreements.

106.    These false representations were made in order to induce Plaintiffs into believing that the fees charged to Plaintiffs and deducted from the amount funded of the MCA Agreements were legitimate fees charged to offset the costs of services provided by the Enterprise MCA Companies under the MCA Agreements.

107.    Plaintiffs reasonably relied upon these representations in entering into the MCA Agreements and, ultimately paying the fees through the "Daily Payments."

108.    Under each of the MCA agreements, Defendants promised to advance certain amounts as identified in each of the MCA agreements.

109.    Defendants did not advance the amounts as promised.

110.    Under each of the MCA agreements, Defendants were entitled to debit through ACH withdrawals certain amounts as identified in each of the MCA agreements.

111.    As described in detail above, Defendants debited more than they were entitled to debit under each of the MCA agreements.

112.    As a direct and proximate result of Defendants' breach of each of the MCA agreements, Plaintiffs have been damaged in the amounts described in detail above.

113.    In the event that the Court finds that each of the MCA agreements are valid and enforceable and not void *ab initio* as a matter of law, then Plaintiffs are entitled to direct and consequential damages caused by Defendants' breach of each of the MCA agreements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order:

a)    Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensation, direct, and consequential damages, including prejudgment interest, in an amount no less than $249,185.00;

c)    Awarding treble damages, including all money, fees and interest wrongfully charged to Plaintiff, in an amount not less than $747,555.00;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.


Dated:  September 11, 2023

                                        **WHITE AND WILLIAMS LLP**

                                        By: */s/ Shane R. Heskin*
                                        Shane R. Heskin
                                        1650 Market Street, Suite 1800
                                        (215) 864-6329
                                        heskins@whiteandwilliams.com
                                        *Attorneys for Plaintiffs*